### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

**CIVIL ACTION NO. 4:19-CV-186-JHM**

**TRAVELERS CASUALTY INSURANCE**
**COMPANY OF AMERICA,**                    **PLAINTIFF/COUNTER-DEFENDANT**

**V.**

**MUDD'S FURNITURE SHOWROOMS, INC.,**
**CMS ROOFING, INC., and**
**JARON JAGGERS**                    **DEFENDANTS/COUNTER-PLAINTIFFS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment. Plaintiff/Counter-Defendant Travelers Casualty Insurance Company ("Travelers") filed a Motion for Summary Judgment [DN 43] concurrently with Defendant/Counter-Plaintiffs' motion [DN 40-1]. Fully briefed, this matter is ripe for decision. For the following reasons, Defendants' Motion for Summary Judgment [DN 40-1] is DENIED and Travelers' Motion for Summary Judgment [DN 43] is GRANTED IN PART and DENIED IN PART.

### I.    BACKGROUND

This is a protracted insurance dispute resulting from roof damage to a Mudd's Furniture Showrooms ("Mudd's") building caused by a severe wind and rainstorm (the "Loss"). The Loss occurred on or around April 12, 2017 at Mudd's former showroom-turned-storage building in Owensboro, Kentucky. Travelers is Mudd's commercial property insurer. The parties were unable to resolve the claim, and Mudd's invoked the appraisal process under the policy. The resulting appraisal award, which Travelers deems invalid, prompted Travelers to file this declaratory judgment action.

A. <u>The Initial Loss and Investigation</u>

A storm damaged the roof of Mudd's secondary showroom/storage facility in April of 2017, causing rainwater to penetrate the exposed roof surfaces.  Mudd's notified Travelers of the Loss—though not until June 8, 2017.  [DN 40-1 at 2].  After receiving notice, Travelers inspected the site of the Loss around June 15, 2017.  [*Id.*].  Travelers' representative, Chris Holhubner, initially determined that the damage was limited to a single upper section of the roof.  [DN 40-2 at 40–41].  Mr. Holhubner stated that despite examining further areas of water infiltration beneath other sections of the roof, he believed that this damage pre-existed the storm and thus did not allocate insurance funds to remediate the interior damage in these areas.  [*Id.* at 77–78].  Nevertheless, Travelers adjusted the loss claim at that time, making a payment reflecting only the replacement of the metal roof covering, some exterior roof patching, and limited interior water damage in the rooms located beneath the single section of roof.  [DN 40-1 at 3].  The value of Travelers' initial claim assessment, made on June 29, 2017, was $80,966.38, with the actual cash value assessment [ACV] at $57,025.46.  [*Id.*].  After making further adjustments and reductions to the assessment and applying the Policy deductible of $10,000, Travelers paid Mudd's an ACV payment of $40,755.80.  [*Id.*].

In August of that year, Mudd's entered into an agreement with CMS Roofing, Inc., a roofing contractor, which authorized CMS to assist Mudd's in the insurance claim.  The agreement entrusted CMS with the task of performing the repair work on the roofing, the scope of which would be determined by Travelers' ultimate loss adjustment.  [*Id.*].  Shortly thereafter, CMS inspected the roof and discovered additional damage.  CMS contacted Travelers on September 11, 2017 to report that it found another section of the roof to be damaged, which was unaccounted for in Travelers' initial adjustment.  Mudd's and CMS state that this additional damage explains the

2

water leakage that continued inside the building even after the initial claim adjustment, despite tarps being placed on the upper tier roofing.  [*Id.* at 4].  CMS applied new tarps to both the upper tier section and the lower section of roofing (where it had discovered the additional damage, unobserved by Mr. Holhubner).  [*Id.*].

Responding to CMS's discovery, Travelers deployed engineers and inspectors to the property to check it out themselves.  A subsequent engineering report confirmed CMS's findings and acknowledged further areas of damage beyond Travelers' initial assessment.  Travelers thus re-evaluated the claim in December 2017 and permitted more money to be paid to cover the exterior roofing damage.  However, Travelers did not re-evaluate its findings with respect to interior damages and provided no funds for the interior portions of the claim.  [*Id.* at 4].  Travelers' re-adjustment increased the claim allowance to $154,887.84, with a $114,910.64 ACV.  [*Id.*].  Travelers accordingly paid Mudd's $64,154.85 (the difference between the initial ACV paid in June and the newly calculated ACV in December).  [*Id.*].

Mudd's authorized CMS to proceed with the roof replacement.  [*Id.*].  CMS completed the roof replacement for the areas covered by the re-adjustment in June 2018.  [*Id.* at 5; DN 43 at 21].

B.  The appraisal

Despite Travelers' adjustments, Mudd's and CMS's Jaron Jaggers ["Jaggers"] retained doubts about whether the claim assessments were accurate and sufficient to cover the full extent of the damage.  Mudd's assigned its rights in the insurance claim to Jaggers.  [DN 40-1 at 4–5].  Thereafter, Jaggers had discussions with Mr. Denis Rowe, Vice President and Partner in The Howarth Group, which is a firm that provides insurance claim consulting services to policyholders.  Jaggers, Rowe, and Chuck Howarth, President and Founder of the Howarth Group, had a dinner meeting where they discussed the claim.  [DN 43-9 at 35–36, 77].  Mudd's and Jaggers

subsequently signed an Appraisal Employment Agreement naming the Howarth Group as their appraiser.  [*Id.* at 32; DN 43 at 7].  On June 12, 2018, Howarth sent a letter to Travelers, along with a copy of the Appraisal Employment Agreement, invoking the appraisal provision of the policy on behalf of Mudd's and Jaggers.  [DN 43-9 at 83–84].  The terms of Howarth's compensation were redacted from the agreement.  On April 23, 2019, Travelers responded and requested that these portions be unredacted.  [DN 40-1 at 5].  Howarth complied and returned an unredacted version to Travelers.  The fee arrangement in the original Appraisal Employment Agreement between Howarth and Mudd's was for an hourly rate of $375, with the total fee to be capped at no more than 30% of any additional amounts recovered by Mudd's through the appraisal process (a "contingency fee cap" arrangement).  Furthermore, the agreement stated: "*should the process produce no additional settlement then no fee will be due.*"  [Appraisal Employment Agreement, DN 34-6 at 1].  Also, later during discovery it was learned that Jaggers and Howarth had discussed a general "bird-dogging" relationship whereby Jaggers would be paid a referral for all business he would bring to the Howarth Group.  [DN 43-9 at 37–38].  Specifically, in this case, Howarth agreed to pay Jaggers a 15% referral fee for the appraisal work, to be paid from Howarth's fee as the appraiser.  [DN 40-1 at 5].  In addition, Howarth promised not to "fee on any line-items agreed to between them and the Traveler's adjuster (or appraiser)."  [Howarth's Memorandum of Understanding, DN 34-5].

After the appraisal process was invoked, Travelers chose David Dunn as its appraiser. Pursuant to the Policy, Howarth and Dunn then agreed to select Mike Ward to be the umpire on the appraisal "panel" (the panel comprising Howarth, Dunn, and Ward).  [DN 40-1 at 5].

Travelers had previously notified Mudd's that it was reserving its rights to deny any further payment on the claim, alleging that interior water damage was not the result of a covered loss but

instead resulted from wear and tear or rust, corrosion, decay, or other property defects.  [*Id.* at 6].  This August 3 letter did not allege any failure on the part of Mudd's in complying with conditions precedent on the Policy.  [*Id.*].  Travelers raised no issue with respect to Mudd's delayed notice of the initial Loss or any failure to protect the property from further loss.

After receiving Howarth's estimate for the interior damages to the building, Travelers responded in November 2018, disputing any damage in certain rooms identified by Howarth, reaffirming its belief that any extra interior damages were caused by inherent defects rather than the Loss, and claiming that umpire Ward lacked authority to determine the "cause" of the interior damage.  [*Id.*].  Travelers further directed Ward to separate the "disputed" damages from "undisputed" ones (damages resulting directly from the Loss) and to omit damages not caused by the Loss in his Award.  Again, Travelers made no mention of Mudd's failure to protect the property from further damages.

The appraisal panel conducted several meetings, including an on-site inspection in March of 2019—nearly two years after the Loss.[1]  [DN 34 at 8].  Umpire Ward considered submissions from both parties reflecting its perceived amounts of loss, respectively.  Dunn's roofing estimate (for Travelers) was $104,886.92, while Howarth's estimate was $239,061.92.[2]  [DN 1 at 10].  After reviewing the submissions, Ward issued an Award, which was signed by both he and Howarth, pursuant to the Policy's requirement that two parties to the appraisal panel must agree for an Award to be enforceable.  [*Id.*].  The Award comprised two separate estimates created by Ward, one for exterior roofing damage and one for interior damage.  The Award determined the cause of the Loss to be wind and water damage and set the Loss amount as $784,754.64 ACV and $844,290.37 RCV.

---

[1] This was the first time that umpire Ward had inspected the building.
[2] The estimates that Jaggers and CMS gave to Ward separately, which Travelers claims were at the direction of Howarth, totaled $246,573.68 and $233,895.36.  [DN 34].

The exterior damage estimate consisted of $283,827.42 RCV, and the interior estimate amounted to $500,927.22 for ACV and $560,462.95 for RCV. [*Id.*].

To date, Travelers has paid a total of $141,169.64 to Mudd's concerning the Loss.

C. Dispute of the Award and Travelers' complaint

Travelers filed a Complaint for Declaratory Judgment in December of 2019. [DN 1]. In it, Travelers alleged that it was not liable for many damages contained in the Award, that certain damages are excluded by the Policy, and that umpire Ward exceeded his authority and made gross errors in his estimates. [*Id.*]. Travelers first accused Mudd's of breaching its duties under the insurance policy by (1) failing to give timely notice to Travelers of the loss by waiting seven weeks to give notice, and (2) failing to preserve and protect the property from further water damage, taking "no reasonable steps" to repair or mitigate the interior damage for the entire 23 months in between the Loss and the date of the Appraisal. [*Id.* at 1–2]. Travelers also claimed that it was not liable for the Award to the extent it exceeded the amounts actually incurred by Mudd's for roof replacement to that date. [*Id.* at 2]. Travelers then filed an Amended Complaint, making additional allegations that the Award should be vacated because Howarth was not impartial as Mudd's appraiser, as required by the Policy, owing to his contingency fee-based arrangement with Jaggers. [DN 43 at 2]. Travelers claims that Mr. Howarth colluded with Jaggers to submit inflated roofing estimates for the appraisal, rather than disclose the amounts actually incurred by Jaggers and CMS to replace the roofs, because he had a direct financial interest in the outcome of the appraisal. [*Id.*]. Travelers added that umpire Ward improperly made coverage determinations in his Award concerning the "cause" of interior water damage and failed to segregate the Award between covered and uncovered items of damage, thus exceeding his authority. [*Id.* at 2–3].

In its Amended Complaint, Travelers asks the Court to set aside the Award and declare that Travelers' liability under the Policy is limited to the money actually incurred by Mudd's for the roof replacement—$50,000—which is the amount Mudd's had already paid to CMS on its roofing contract.  [DN 34 at 21].  In the alternative, Travelers says the most Mudd's can recover for the replacement of the roof is $154,886.87 (the price of Mudd's contract with CMS).

D. <u>Cross-motions for summary judgment</u>

After discovery was conducted on issues related to the claim investigation and scope of the appraisal, both parties filed motions for summary judgment.  Mudd's asks for deference to the Award.  Travelers seeks to set aside the Award in its entirety for a myriad of reasons, most of which were presented in the Amended Complaint.

The Court can discern four reasons offered by Travelers for overturning the Award: (1) Howarth's lack of impartiality due to his financial interest in the outcome and contingency fee arrangement; (2) the alleged "material misrepresentations" by Jaggers and Howarth in their respective estimates; (3) Mudd's failure to protect the building from further losses in the two years between the Loss and Award, in contravention of the clear Policy language, and (4) the umpire's lack of authority to make a determination of "cause" under law.

Mudd's argues that it and CMS did not have a fixed sum contract for repair/replacement of the roofing, but rather a verbal understanding that CMS would perform the repair work specified in Travelers' claim adjustment for the amount ultimately paid out by Travelers, which at that time only amounted to $154,886.67.  [DN 40-1 at 8].  Mudd's argues that instead of being a fixed-sum contract for the full repair of the roofing and interior damage, it was a "recovery-based" contract as it did not preclude the possibility of a more extensive repair for an amount to be decided by the umpire or otherwise agreed to by Travelers with further negotiations.  Mudd's also disputes

Travelers' characterization of Howarth and Jaggers' estimates as intentionally misleading, arguing that Jaggers and CMS never fully billed Mudd's for the work performed because the arrangement stipulated that CMS would only perform the work for the amount allowed for in Travelers' claim adjustment.  [*Id.* at 9].  Mudd's argues the estimates fall far short of constituting "fraud" under the Policy exclusion.

As for Travelers' criticisms of Howarth and Jaggers' contingency fee-based arrangement, Mudd's underscores that the arrangement was a contingency fee arrangement capped at a certain percentage, which it argues does not cause the kinds of improper financial incentives that Travelers and various courts attribute to pure contingency fee arrangements.  Moreover, Mudd's emphasizes that when Travelers pressed the Defendants on the compensation arrangement, Howarth, Mudd's, and Jaggers all agreed to amend the Appraisal Employment Agreement to remove that term.  [*Id.* at 16].

With respect to Mudd's alleged failure to protect the building from further damage and deterioration, Mudd's argues that despite its persistent efforts, it took many months to find a roofing contractor who was willing and able to perform the replacement work (Mudd's did not connect with CMS until August).  [*Id.* at 19].  Mudd's also cites the omissions Travelers made in its initial assessment, failing to include other damaged roofing and interior areas in its first claim adjustment.  Mudd's was only able to place temporary tarping on the areas of the roof believed to be damaged in the months preceding CMS' initial repair work, which was insufficient to prevent further water damage to the building's interior.  [*Id.* at 19–22].

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

The parties have filed cross motions for summary judgment.  Counts II and III of Travelers' Amended Complaint seek a declaration from the Court that the interior Building damages are excluded from coverage under the policy for a variety of reasons—policy exclusions, limitations and breach of duties.  Count IV asks the Court to declare that liability under the policy for the roof repair is limited to the amount actually spent by Mudd's on the roof repair.  After consideration, the Court concludes that there are genuine issues of fact that exist with respect to these claims sufficient to preclude summary judgment for either party on Counts II, III and IV.

Count I asks the Court to set aside the appraisal award, again for numerous reasons, but primarily because of Howarth's lack of impartiality as an appraiser and his financial arrangement with Jaggers.

Travelers argues strenuously that Howarth was paid on a contingency fee basis and thus cannot be an impartial appraiser.   Travelers suggests that the subsequent amendment to the Appraisal Employment Agreement was a sham designed to cover up the true contingency fee arrangement.   In *Veranda Gardens*, the court strongly suggested that a contingency fee arrangement would render an appraiser not impartial because it would generate a "personal stake in the appraisal results." *Veranda Gardens, LLC v. Secura Ins.*, No. 3:18-cv-611-DJH-RSE, 2019 WL 2438788, at *4 (W.D. Ky. June 11, 2019).   When appraisers have a contingency fee arrangement in place but later retract it, like what Howarth did in this case, courts have still found the agreement to improperly affect the appraiser's ability to be impartial.   *See Auto-Owners Ins. Co. v. Summit Park Townhome Association*, No. 14-cv-03417-LTB, 2016 WL 1321507, at *5 (D. Colo. Apr. 7, 2016).

In *Auto-Owners*, the appraiser in an insurance dispute had a contingent cap on his compensation, but the fee agreement was amended three months after his appointment as appraiser and well before any substantive work of the appraisal panel had occurred.  *Id.*  Nevertheless, the appraiser had performed some work while the initial contingency fee agreement was still in place. *Id.*  The party represented by the appraiser in *Auto-Owners* claimed that rather than being intended to incentivize a higher appraisal award, the contingent cap was merely made to "limit the amounts that would be charged to the policyholder in the event that the appraisal panel determined that only a limited amount was owed."  *Id.*  The court disagreed.  The court found that this explanation demonstrated the problem of such a contingent cap arrangement, writing that "an appraiser

10

operating under such an agreement has a motive to ensure that the appraisal panel *does not* 'determine[] that only a limited amount was owed,' (in the insured's words), but, rather, determines that a *greater amount* was owed" so that the appraiser can come away with a profit. *Id.* The court concluded that the appraiser's operation under the contingent cap agreement, even for a short period, was sufficient, by itself, to render him not impartial. *Id.*

Travelers points to numerous cases in other jurisdictions which hold that appraisers who are compensated on a contingency fee basis cannot be "impartial." *See Shree Hari Hotels, LLC v. Soc'y Ins.*, No. 1:11-CV-01324-JMS, 2013 WL 4777212, at *2 (S.D. Ind. Sep. 5, 2013) (disqualifying an appraiser who had a contingency fee agreement capped at a certain percentage of recovery, writing: "[i]t is axiomatic that an appraiser with a financial interest in the outcome of the appraisal is not impartial."); *Chardonnay Vill. Condo. Ass'n, Inc. v. James River Ins. Co.*, No. 06–4878, 2008 WL 3285908, at *1 (E.D. La. Aug. 9, 2008); *Landmark Am. Ins. Co. v. H. Anton Richardt*, No. 2:18-cv-600-FtM-29UAM, 2019 WL 2462865, at *3 (M.D. Fla. June 13, 2019) (disqualifying  an appraiser who had a contingency fee agreement and holding that "a pecuniary interest in the outcome [of the appraisal] is by definition a personal interest that favors one side over the other.").  In contrast, Jaggers and Mudd's point to *Cobblestone* as an example of a case where a court found that a contingency fee cap on an hourly fee agreement did not automatically render an appraiser incapable of being impartial.  *Cobblestone Condominium Assoc., Inc. v. Travelers Cas. Ins. Co.*, 377 F. Supp. 3d 1291, 1303 (N.D. Ala. 2019).

While a fee cap may not necessarily be problematic under the case law, a provision that states "should the process produce no additional settlement then no fee will be due" clearly is. [DN 34-6 at 1].  Here, Howarth's initial fee arrangement clearly incentivizes him to expand the scope of loss in this case.  Whether the fee arrangement was modified to remove such provisions

11

is disputed, but the fact that it was there at the beginning is indicative of Howarth's mindset with respect to the appraisal.  Howarth initially proposed the contingent cap because he wanted Mudd's to "benefit" from his appraisal.  [DN 43-9 at 171].  An appraiser must not show bias or favoritism to any party or do the partisan bidding of one side.

The question of Howarth's impartiality runs deeper than simply his fee arrangement, particularly when viewed against the following case law:

> Appraisers shall not "represent either party to the controversy or be a partisan in the cause of either, nor is an appraiser expected to sustain the views or to further the interest of the party who may have named him."  The appraisers, "having been selected to act instead of the court and in the place of the court, must, like a court, be impartial and non-partisan." *Hall v. Western Assurance Company*, 133 Ala. 637, 639-40 (1902).  Although "appraisers are appointed by the parties, they are not subject to the control of the parties … If appraisers were subject to the direction of the parties, the whole proceeding would become a useless ceremony." *Norwich Union Fire Ins. Society v. Cohn*, 68 F.2d 42, 44 (10th Cir. 1933).

*Woods Apartments, LLC v. United States Fire Ins. Co.*, No. 11-41-C, 2012 WL 12996189, at *1 (W.D. Ky. Dec. 11, 2012).

Other facts in the record call into question Howarth's impartiality as well.  Howarth is not one who occasionally acts as an appraiser in an insurance dispute.  Acting as an appraiser is now his principal business.  For years he worked for insurers but he now has "started representing policyholders." [DN 43-9 at 179].  His firm no longer does much public adjusting.  Instead, once it finds a good opportunity, it utilizes the appraisal provisions in insurance policies because it is "a better process to resolve these claim disputes." [*Id*. at 18].  In fact, even though he acknowledges that it is the policyholder who must invoke the appraisal process, his firm actually sends the letter to the insurance company because "it's just easier if I do it."  [*Id.* at 84].  His business is to help policyholders when his focus as an appraiser should be to fairly and impartially value a loss.

12

In this case, Howarth initially got involved when he learned from Denis Rowe of an opportunity where his firm could add "scope" to an insurance claim.  [DN 43-9 at 38].  Jaggers, Rowe, and Howarth had meetings where they discussed the claim and the idea that Howarth's fee would come from adding "scope" to the interior damage to the building.  [*Id.*].  Even before the appraisal process was invoked, Rowe advised Howarth that "we could add another 100 to 150 [thousand dollars] on the claim."  [*Id.* at 39].  At his deposition, when Mr. Howarth was asked how much his firm added to Mudd's insurance claim, he answered: "[a] lot more than that" (referring to the $100,000–$150,000 range).  [*Id.*].  Seemingly aware of how biased this answer sounded, he attempted to backtrack, hoping to improve his answer: "[O]ur firm didn't add it.  It was determined by an appraisal panel."  [*Id.*].

Howarth initially tied his fee to whatever amount was added over what Travelers had already offered in settlement.  Moreover, he tried to hide this from Travelers, redacting the portions of both his compensation package and Jaggers' referral fee in correspondence with Travelers.  Further comments from Mr. Howarth show his general bias towards insureds over insurers: "The insured is the one that suffered the loss.  They ought to be getting the lion's share of the settlement.  It's a shame they have to hire a company like mine to start with to get a fair and proper payment for their claim."  [*Id.* at 75].  These comments are suggestive of Howarth's general favoritism towards insureds.  *See Veranda Gardens*, 2019 WL 2438788, at *4; *Woods Apartments*, 2012 WL 12996189, at *1.

Additionally, the relationship that Howarth had with Jaggers, the roofer—who became the insured via an assignment—is more than troubling. Cultivating a relationship with a roofing contractor like Jaggers is apparently important to Howarth's business, so much so that Howarth was willing to pay Jaggers 15% of any compensation he received from serving as the appraiser on

this claim.  Mudd's suggests there is nothing inappropriate about such an arrangement.  The Court disagrees.  This type arrangement means the higher the Award, the more money Jaggers earns, both as an assignee of the claim, and in a referral fee.  This would no doubt please Jaggers very much.  And Howarth's eagerness to please Jaggers is evident—when Jaggers was having problems with the roofing estimate and "go[es] silent," Howarth sends him an email, telling him to call him "if you still want me to pursue the additional on the roof for you and your company."  [DN 43-9 at 166, 171].  A satisfied Jaggers is more likely to send additional business to the Howarth Group.  And Howarth is not going to bill Mudd's/Jaggers on any line-item associated with the roof that he and Travelers' appraiser agree upon—thus, Howarth has a financial incentive to disagree with the other appraiser.

This discussion certainly paints an unflattering picture of the Howarth Group and its practices.  It is not the Court's intention to suggest that the Howarth Group is incapable of performing appraisal work in a fair and impartial manner.  The firm has obvious expertise.  The Court is merely concluding that, under these facts, the Howarth Group crossed the line.  The word "impartial" means unbiased and disinterested—not favoring either side over the other.  *See Veranda Gardens,* 2019 WL 2438788, at *3.  Rather than being disinterested and agreeing to undertake the task of rendering a fair and impartial appraisal, no matter the outcome, Howarth concluded from the outset that it could add "scope" to the project, going so far as to promise the insured that if it could not add value, it would charge nothing for the effort.  While adding value is the understandable desire of the insureds, an impartial appraiser should not begin his work with this as the goal.  Howarth might ask here, "why should we get involved if we don't think we can help the policyholder add value to the claim?"  The answer is: get involved as an adjuster, not as

an appraiser, if it is your desire to help the policyholder. Again, an appraiser must not show bias or favoritism to any party or do the partisan bidding of one side.

The Howarth Group uses the appraisal process as a tool to help policyholders, which in the Court's opinion is not how the process should work.  Perhaps this way of thinking is naïve on the Court's part and does not reflect the practicalities of the real world, but it just seems wrong for an appraiser to start out with a preconceived notion that it can, or should, add value to a claim.  Lastly, paying a roofer, who has been assigned the insurance claim, a referral fee for the opportunity to act as the appraiser just plain looks bad, smells bad, and is bad.

Based on the foregoing, the Court concludes that no reasonable jury could determine that Howarth acted as an impartial appraiser in this case.  Accordingly, for these reasons, the Court grants summary judgment to Travelers on Count I and vacates the Award.[3]

## IV. CONCLUSION

For the reasons set forth above, the appraisal Award is **VACATED**, and **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [DN 40-1] is **DENIED** and Travelers' Motion for Summary Judgment [DN 43] is **GRANTED IN PART** and **DENIED IN PART**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

March 28, 2022

cc:      Counsel of Record

---

[3] Given that the Court has concluded the Award must be set aside, it is not necessary at this time to decide whether the umpire exceeded his authority or otherwise acted inappropriately.

15